# Preliminary Expert Report of Eric Francis Naugle

1. My name is Eric Francis Naugle. I have been actively employed in police practices and law enforcement since 1988. I was an active law enforcement officer from 1988 to 2001 and 2002 to May 2021. Since my retirement from law enforcement in May 2021, I have been involved in law enforcement and security/intelligence practices as a Use of Force Instructor and Transportation Security Administration Academy Instructor at the Federal Law Enforcement Training Center, Glynco, Georgia. I have additionally been a private consultant in the field of traffic accident reconstruction and police practices since 2010.
2. My education includes an associate degree in information technology in Networking Administration. I have a Georgia Post Supervisory certification, Georgia Post Law Enforcement General Instructor Certification, Georgia POST Driver Instructor Certification, Federal Law Enforcement Training Center Instructor Certification, Federal Law Enforcement Training Center Driver Instructor Certification, Use of Force Instructor, Non-lethal Training Ammunition Instructor, Human Performance Instructor, Certified Peace Officer by the Georgia Peace Officer and Training Council (P.O.S.T.C.).
3. I have been an adjunct instructor at the Savannah Peace Officer Academy located in Pooler, Georgia since 2013. In that capacity I was responsible for teaching law enforcement courses to basic training cadets regarding traffic accident investigation, DUI law, advanced traffic law, and police procedures.
4. I have been in law enforcement supervision and management since 1992. My most recent management position was a Lieutenant with the Glynn County Police Department where I served as a patrol supervisor, patrol watch commander, traffic unit supervisor, traffic unit commander, and department training officer.
5. I was a member of the policy committee at the Glynn County Police Department, tasked with reviewing and updating police department policy to align with the Georgia Chief's of Police and the CALEA accreditation programs.
6. I have developed, modified, and written law enforcement course lesson plans. However, I have never published my work.
7. I have conducted training for law enforcement officers overseas, across the continental United States, and within the state of Georgia. I have provided training in the following areas:
   - Traffic Accident Investigation and Reporting
   - Motor Vehicle Law
   - Setup and Operation of the Total Station Mapping System
   - Basic Crash Investigation
   - Crime Scene Mapping using the Total Station Mapping System
   - Crash Investigation Mapping Using the Total Station Mapping System
   - Computer Aided Diagramming using AutoCad and CrashZone
   - Georgia Electronic Accident Reporting System (GEARS)
   - Use of Force
   - Post Incident Procedures
   - Designing, Developing, and Evaluating Labs and Practical Exercises
   - Student Centered Feedback Model
   - Non-lethal Training Weapons and Ammunition
   - Human Performance

- X-Ray operator
- Pat-downs
- Improvised Explosive Devices
- Explosives detection screening
- Additional Screening of Individuals
- Additional Screening of Property
- Advanced Imaging Technology
- Individuals with Disabilities Screening Procedures

8. I am a former non-commissioned officer with the United States Army Military Police where I served on active duty for 7 years, 4 months and 10 days. During my tenure with the U.S. Army Military Police, I served in the following capacities: patrol officer, criminal investigator, AWAT officer, desk sergeant, black marketing investigator, juvenile crimes investigator and NCOIC, and traffic accident investigator. My entire service consisted of garrison law enforcement duties.
9. I have been a Georgia peace officer since July of 1995. I am a retired Lieutenant with the Glynn County Police Department, Brunswick Georgia. During my tenure as a Georgia law enforcement officer, I have served in the following capacities: patrol officer, shift supervisor, watch commander, department training officer, special duty unit officer, traffic accident investigator, traffic accident reconstructionist, traffic unit supervisor, traffic unit commander, H.E.A.T. unit commander, and SWAT officer.
10. The course on Traffic Accident Investigation and reporting focuses on response to the scene, identification of roadway and vehicle evidence, interpretation of evidence, eyewitness testimony, determining contributing factors, and report writing.
11. The course on motor vehicle law focuses on Title 40 of the Official Code of Georgia Annotated (O.C.G.A.). Students are taught the laws related to motor vehicles and how to enforce them.
12. The course on Setup and Operation of the Total Station Mapping System focuses on the science behind the equipment, identifying equipment parts and functions, how to set up the system and related software, how to map a crime scene, and how to download the data to a computer aided diagramming software program.
13. The course on Basic Crash investigation focuses on response to the scene, identification of roadway and vehicle evidence, interpretation of evidence, eyewitness testimony, determining contributing factors, and when to contact a traffic accident investigator.
14. The course Crime Scene Mapping using the Total Station Mapping System focuses on the unique aspects of measuring crime scenes to create a three-dimensional (3D) diagram of the scene for presentation in court.
15. The course Crash Investigation Mapping Using the Total Station Mapping System focuses on the unique aspects of measuring crash scenes to create two-dimensional (2D), and 3D diagrams, and how to create accurate animations for presentation as evidence in court.
16. The course on Computer Aided Diagramming using AutoCad and CrashZone focuses on the unique aspects of each program and how to use them in conjunction with the total station to create scene diagrams.
17. The course on Georgia Electronic Accident Reporting System (GEARS) focuses on completing the Georgia Uniform Traffic Accident Report using the GEARS software program.

18. The course on Use of Force focuses on the constitutional requirements of police use of force and understanding the relevant legal opinions by the United States Supreme Court.
19. The course on post-incident procedures focuses on what do after a law enforcement officer involved shooting.
20. The course on Designing, Developing, and Evaluating Labs and Practical Exercises teaches the student instructor how to design, develop and evaluate labs and practical exercises by providing instruction on the elements necessary for each component, as well as the legal aspects required for the training.
21. The course on the Student-Centered Feedback model focuses on teaching the instructor how to elicit information from a student in a manner that is both positive and facilitates the student learning.
22. The course on Non-Lethal Training Weapons and Ammunition focuses on the use of modified weapons and ammunition which can safely be used in a live training environment.
23. The course on Human Performance focuses on what happens to the mind and body during tense, uncertain, and rapidly evolving use of force encounters with police officers.
24. The following course specifics are classified as Sensitive Security Information by the United States Government, the Department of Homeland Security, and the Transportation Security Administration and may not be divulged:
    - X-Ray operator
    - Pat-downs
    - Improvised Explosive Devices
    - Explosives detection screening
    - Additional Screening of Individuals
    - Additional Screening of Property
    - Advanced Imaging Technology
    - Individuals with Disabilities Screening Procedures
25. I have over three decades of experience developing, conducting, investigating, and instructing law enforcement operations and policy/procedure.
26. My experience, training, and background exceeds the information in this report. Additional information can be provided upon request.
27. I have reviewed the following materials to date regarding this case:
    a. Georgia Motor Vehicle Crash Reports completed by Savannah Chatham Metropolitan Police Department (SCMPD)
    b. Case supplements from SCMPD
    c. The first indictment against Mr. Fehrle
    d. The second indictment against Mr. Fehrle
    e. Search warrant for blood of Mr. Fehrle
    f. Search warrant for Fehrle vehicle and airbag control module
    g. Witness statements
    h. Scene photographs from SCMPD
    i. Vehicle examination photographs of Fehrle vehicle from SCMPD
    j. 18 pages of Fehrle medical records obtained by Corporal Walp
    k. Large production of Fehrle medical records (892 pages)
    l. GBI lab reports of Fehrle and Bailey
    m. Drag sled testing notes from Corporal Walp of SCMPD
    n. Crash scene diagramming by SCMPD

o. Criminal history of Mr. Fehrle
p. Chatham County Detention Center Care Report
q. SCMPD General Order for Public Records
r. Additional SCMPD General Orders
s. Injury Diagram of Mr. Fehrle from SCMPD
t. Intergovernmental agreement between Savannah and Chatham County Georgia
u. Personnel file of Corporal Walp
v. Separation of Corporal Walp from Savannah
w. Fehrle text messages
x. Training records of Corporal Walp
y. Notice of lawsuit (Ante Litem Notice)
z. Amended Complaint
aa. Defendants' discovery responses
bb. Plaintiff's discovery responses
cc. Plaintiff's initial disclosures
dd. Deposition of Assistant Chief Gavin
ee. Deposition of Mr. Fehrle
ff. Deposition of Corporal Walp
gg. Declaration of Dr. Schere

28. This expert report is based upon the materials provided to date. The opinions presented in the report are based upon my specialized experience, training, and knowledge of police practices, traffic crash reconstruction, forensic examination of evidence, and my continued research in law enforcement. This work includes conducting training for law enforcement throughout the United States. My opinions are provided with reasonable certainty within the fields of law enforcement, police activity, supervision, and management. I am familiar with civil litigation and discovery. I recognize that there may be additional documentation as the case progresses. If additional material is produced, I shall be prepared to provide a supplemental report as necessary.

29. This report is based upon the facts as they are presented by the material and does not draw conclusions based upon credibility issues of the parties.

30. On the afternoon of August 21, 2016, the decedent in this case, Ms. Shannon Bailey, was a 36-year-old female who was riding as a front seat passenger in Mr. Fehrle's vehicle, a 2012 Volkswagen CC Sport VIN: WVWMN7AN5CE516142. A traffic accident occurred resulting in the death of Ms. Bailey.

31. This crash occurred at approximately 2:48 pm in the 1200 block of East Anderson Street, between Live Oak and Cedar Streets in Chatham County, Georgia. The posted speed limit is 35 mph, although some of the police reports state that it is 30 mph. SCMPD Motor Vehicle Crash Report #160821114.

32. Mr. Fehrle was originally charged with the following: Homicide by Vehicle 1st Degree 40-6-393(a) (DUI Drugs), Homicide by Vehicle 1st Degree 40-6-393(A) (Reckless Driving; 20 mph over the speed limit), DUI Less Safe (Drugs) 40-6-391(a)(2), Reckless Driving 40-6-390 (Only references speed), and Hit and Run 40-6-270.

33. Homicide by Vehicle (1st Degree) requires probable cause to believe the defendant either improperly passed a school bus loading or unloading O.C.G.A. § 40-6-163, operated a vehicle in reckless disregard for the safety of persons or property, operated a vehicle while under the influence of alcohol, drug, or toxic vapor O.C.G.A. § 40-6-391, and/or left the

scene of an accident involving personal injury to or death of person or damage to vehicle O.C.G.A. § 40-6-270. Re: Georgia Law Enforcement Handbook, Criminal Law & Procedure, 2016-2017 Edition, Thomson Reuters.

34. O.C.G.A. § 40-6-163: No evidence was presented for this offense.
35. O.C.G.A. § 40-6-270 Leaving the Scene of an Accident with Injury, Death, or Damage: Corporal Walp pursued charges against Mr. Fehrle for "Hit and Run". Corporal Walp reported that Mr. Fehrle failed to immediately stop his vehicle after being involved in a collision with the vehicles prior to him striking the trees.
36. O.C.G.A. §40-6-391(a): Corporal R. Walp of the SCMPD relied upon an 18-page, incomplete, medical report to support his conclusion that Mr. Fehrle was under the influence of drugs at the time of this crash. The 18-page report obtained by Corporal Walp reported an admission time of 3:32PM on August 21, 2016, under the alias, Jason Gracia (Pg. 1) and revealed Mr. Fehrle received pre-hospital admission treatment (Pg. 2) and was intubated in the trauma bay during the primary survey by medical personnel (Pg. 3).
37. The first reported blood testing was initiated at 3:39PM on August 21, 2016, and was just a fingerstick (Pg. 5).
38. The second blood collection was initiated at 3:45PM on August 21, 2016, and a negative test result for Ethyl Alcohol was determined (Pg. 5, 6).
39. Hours later, a urine screen was initiated at 5:50PM on August 21, 2016, which revealed the presence of Benzodiazepines (Pg 9).
40. The above information (35, 36, 37, and 38) is information from the 18-page medical report Corporal Walp apparently used in charging Mr. Fehrle. This information is sufficient to call into question the blood sample taken by Memorial Health University Medical Center and conduct further investigation before bringing charges.
41. Mr. Fehrle's medical records from August 21, 2016 clearly reveal he was administered both Fentanyl 50mcg/mL, and Midazolam 1mg/mL among other medications.
42. The Fentanyl and midazolam were ordered at 1536 (3:36PM) on August 21, 2016, by medical staff and administered at 1542 on that date, three minutes before any blood vials were obtained.
43. Corporal Walp failed to conduct a thorough investigation into what if any drugs would have been administered to Mr. Fehrle during this process, what time this occurred, and how that compared with the time of the blood draws by the hospital.
44. Police officers are not to make unwarranted assumptions, they are fact finders and are required to diligently investigate and gather all the facts.
45. According to Corporal Walp, Mr. Fehrle's medical records did not show he was administered Midazolam nor Fentanyl. This has been proven to be false. Corporal Walp's negligence resulted in the DUI charge.
46. O.C.G.A. § 40-6-390: Corporal Walp used the wrong methodology to determine the speed of Mr. Fehrle's vehicle. Mr. Fehrle's vehicle was rotating clockwise while traveling to its final rest. The roadway evidence clearly showed this. Additionally, the tire marks displayed signs of rotating while also sliding on the roadway. This type of speed analysis requires using a spin analysis to estimate speed.
47. Corporal Walp used what is commonly referred to as a slide to stop formula which is used primarily for a vehicle which brakes and slides to stop on its own. A variation of this formula is also used to combine speeds and determine an overall speed across different surfaces.

48. According to Corporal Walp's training records, he was provided with instruction to conduct a spin analysis. Corporal Walp was either negligent in applying his training or incompetent to conduct this level of accident reconstruction.
49. Corporal Walp conducted drag factor testing on the roadway where this crash occurred.
50. According to Corporal Walp, the following measurements were conducted: Drag sled weight: 35 pounds: Pounds of force: 34, 31, 34, 34, 33, 34, 33, 34, 34, 35 Resultant Average: 33.6 Drag factor: f=0.96g
51. The resulting numbers are scientifically unsound for a well-travelled asphalt roadway and are indicative of Corporal Walp improperly using the drag sled and most likely using the static friction results instead of the dynamic friction results.
52. Corporal Walp later conducted additional drag sled testing: Drag sled weight: 50 pounds: Pounds of force: 35, 40, 40, 41, 42, 38, 40, 41, 41, 40 Resultant Average: 39.8 Drag factor: f=0.79g.
53. The resulting numbers are scientifically unsound for a well-travelled asphalt roadway and are indicative of Corporal Walp improperly using the drag sled by not holding the scale and pulling mechanism level with the roadway. The results of Corporal Walp's second drag tests are consistent with either a freshly paved asphalt or concrete roadway.
54. The airbag module from Mr. Fehrle's Volkswagen does not record speed. Corporal Walp allegedly conducted drag sled measurements to determine the drag factor of the roadway where this crash took place. According to Corporal Walp, the following measurements were conducted: Drag sled weight: 35 pounds: Pounds of force: 34, 31, 34, 34, 33, 34, 33, 34, 34, 35 Resultant Average: 33.6 Drag factor: f=0.96g Drag sled weight: 50 pounds: Pounds of force: 35, 40, 40, 41, 42, 38, 40, 41, 41, 40 Resultant Average: 39.8 Drag factor: f=0.79g
55. Corporal Walp then used an improper methodology to conduct a speed analysis using the 0.79g drag factor and the 277.5 feet of skid distance. The resultant speed was reported to be 81 mph.
56. Corporal Walp reported that Mr. Fehrle was driving so fast his speed would rise to the level of Reckless Driving.
57. Corporal Walp based his charge of Reckless Driving on improper use of scientifically sound formulae, and his negligent application of those formulae.
58. Corporal Walp used data which was negligently obtained regarding the speed of Mr. Fehrle's vehicle to go forward with this charge. Additionally, Corporal Walp provided no further basis for Reckless Driving other than speed. It is well known that in the State of Georgia, Reckless Driving cannot be charged by speed alone. There must be some other aggravating factor(s). Corporal Walp made no reference to that effect.
59. The criminal charges were then significantly amended when it was proven to Corporal Walp that Mr. Fehrle had been administered Midazolam and Fentanyl prior to the blood draw he had used to make the DUI charge.
60. Corporal Walp then helped continue the prosecution with a second indictment against Mr. Fehrle for Reckless Driving and other offenses, alleging that Mr. Fehrle had a "known seizure disorder" and was reckless in operating a motor vehicle because he was "not taking his prescribed medicine".
61. However, according to Mr. Fehrle's medical records, he had not been diagnosed with a "seizure disorder".

62. According to Mr. Fehrle's medical records, he had voluntarily sought treatment after his first "possible" seizure and was given a limited prescription for Keppra, which time had expired prior to the date of this accident.
63. The Department of Driver Services for the State of Georgia made no known attempt to revoke or restrict Mr. Fehrle's legal ability to operate a motor vehicle meaning all rights and privileges afforded a citizen of this state to operate a motor vehicle on the public roadways were intact.
64. Mr. Fehrle was operating a 2012 Volkswagen CC VIN: WVWMN7AN5CE516142 Edwards was driving a 2009 Dodge Charger VIN: 2B3KA33V49H571709 Traffic control in the area: One way roadway; 2 lanes; dashed lane lines.
65. The reporting officer stated that Fehrle's vehicle struck the rear of the Dodge Charger. Fehrle was said to be speeding. The Dodge Charger left the roadway, swiping a tree. Mr. Fehrle continued to impact with a tree and rolled over. The impact location to Mr. Fehrle's vehicle with the Dodge Charger was reported to be the left side (driver side) front. The Dodge Charger was reported to be damaged on the right side (passenger side) rear.
66. The Witness stated the Dodge was in the left lane, and Mr. Fehrle's vehicle was in the right lane. The Witness further stated Mr. Fehrle's vehicle bumped the rear of the Dodge Charger a couple of times as if to say get out of the way.
67. Corporal Walp reported in his notes the skid distance for Mr. Fehrle's vehicle was 277.5 feet. Mr. Fehrle traveled an additional 125 feet during the rollover, taking out a tree. Walp said there was no side of the vehicle undamaged from the rollover.
68. The reporting officer stated that Fehrle's vehicle struck the rear of the Dodge Charger. Fehrle was said to be speeding. The Dodge Charger left the roadway, swiping a tree. Mr. Fehrle continued to impact with a tree and rolled over. The impact location to Mr. Fehrle's vehicle with the Dodge Charger was reported to be the left side (driver side) front. The Dodge Charger was reported to be damaged on the right side (passenger side) rear.
69. The Witness stated the Dodge was in the left lane, and Mr. Fehrle's vehicle was in the right lane. The Witness further stated Mr. Fehrle's vehicle bumped the rear of the Dodge Charger a couple of times as if to say get out of the way.
70. Corporal Walp reported in his notes the skid distance for Mr. Fehrle's vehicle was 277.5 feet. Mr. Fehrle traveled an additional 125 feet during the rollover, taking out a tree. Walp said there was no side of the vehicle undamaged from the rollover.
71. Report by Sergeant Fandrich: Tire marks began on the north side of East Anderson Street next to the curb. Mr. Fehrle's vehicle traveled East to the South side of the road. The tire marks began as thin lines, then widened indicating the vehicle was rotating. There were four tire marks which ended at the curb on the South side of the road. An oak tree had a large section of bark missing. A palm tree was "snapped in two" and the roots were exposed.
72. Witness Robinson: Was traveling East in the right lane. Estimated the speed of Mr. Fehrle's vehicle to be approximately 60 to 65 mph. When the VW hit the brakes, it went sideways. When the VW hit the palm tree it flipped over.
73. Witness Brockington: Was traveling in the right lane, Ms. Hobbs was in the left lane. They were side by side. When they crossed over Waters Avenue, the VW drove between them. When the VW got "a couple of yards" in front of them, it "wiggled" and made a sharp right turn. The VW then went off the road and hit a tree.

74. Corporal Walp: Both occupants were seat belted when extricated. EMS reporting confirms Fehrle was in a seatbelt with his legs hanging out of the driver side window.
75. The coroner said the passenger was restrained. The passenger was under the driver. The VW was on its driver's side at rest.
76. Examination of the scene photographs show the passenger in Mr. Fehrle's vehicle belted in at vehicle rest. The pictures show the shoulder belt around her waist with the lap belt. This is another indication that she came out of her shoulder belt in an attempt to gain control of the vehicle during Mr. Fehrle's seizure.
77. Witness Williams: Was on his porch at 1232 East Anderson Street. Said he heard the revving of the engine of the VW. Said he saw it traveling at a high speed. Saw the car on the left side of the road at the time he heard the engine revving. Said the Car started sliding across the roadway and rotated about 90 degrees.
78. Witness McKinney: Said she was at Waters Avenue when the VW went between her car and another at a fast speed. Did not see the crash. Witness Whitfield: Was at the stop sign on Cedar Street facing South. Only observed the car spinning and coming to final rest.
79. Given the vehicle dynamics, witness statements, medical records, and other documents I have reviewed, my opinions are as follows:
80. Mr. Fehrle had a seizure which resulted in his body locking up with his foot on the accelerator pedal.
81. Having a seizure while driving resulted in Mr. Fehrle having no control over his vehicle, nor the ability to stop.
82. Corporal Walp failed to analyze all the evidence which reveals Mr. Fehrle more likely than not had a seizure while driving.
83. Corporal Walp persisted in the charge of Hit and Run, even after he learned that Mr. Fehrle had a seizure while driving.
84. According to Corporal Walp, Mr. Fehrle's medical records did not show he was administered Midazolam nor Fentanyl. This has been proven to be false. Corporal Walp's negligence resulted in the DUI charge.
85. I examined the medical records of Mr. Fehrle and found that he was administered Midazolam and Fentanyl in the hospital at 3:42PM on August 21, 2016. Additionally, Mr. Fehrle was prescribed Keppra by Dr. John M. Allen M.D., Department of Surgery, Memorial University Medical Center.
86. The second indictment of "Hit and Run" is malicious on its face as there was no legal basis for this charge at that time.
87. No objectively reasonable and competent police officer could have looked at the facts in this case and concluded the charges were warranted against Mr. Fehrle.
88. Corporal Walp used capital letters to emphasize negative things in his report regarding Mr. Fehrle, such as "ANY", and "AT FAULT" which in my experience as a police officer, supervisor and commander is indicative of a bias against a defendant.
89. It has been my experience in over three decades as a law enforcement officer that generally, some officers are more interested in making charges stick than they are in finding the truth.
90. The SCMPD failed to properly supervise the actions of Corporal Walp, resulting in the unconstitutional arrest and prosecution of Mr. Fehrle.
91. Supervision is a basic police principle to ensure officers are acting appropriately and within the law to avoid constitutional violations.

92. Based upon my personal experience investigating other traffic accidents in the charge of the SCMPD I have found a lack of training, supervision, and overall investigative diligence whereby I have proven the innocence of aggrieved parties at the hands of the SCMPD.
93. I went to the scene of this crash and conducted drag testing. I conducted 10 individual tests in multiple locations in the area. I recorded and calculated the dynamic friction and static friction for each test. Below are the results: Drag sled weight: 30 pounds: Pounds of force: Dynamic/drag factor Static/drag factor Dynamic 19 0.63 Static 22 0.73 Dynamic 18 0.60 Static 23 0.76 Dynamic 19 0.63 Static 22 0.73 Dynamic 21 0.70 Static 23 0.76 Dynamic 21 0.70 Static 22 0.73 Dynamic 21 0.70 Static 26 0.86 Dynamic 21 0.70 Static 23 0.76 Dynamic 21 0.70 Static 23 0.76 Dynamic 21 0.70 Static 29 0.96 Dynamic 21 0.70 Static 29 0.96 Average: Dynamic 20.3 0.67 Static 24.2 0.80 The above tests I conducted reveal Corporal Walp improperly used the drag sleds. Corporal Walp's drag testing is inconsistent with the roadway this crash occurred on. Corporal Walp was negligent in the application of his training and was not properly supervised.
94. My analysis revealed Mr. Fehrle's vehicle was traveling approximately 60 mph at the beginning of the tire marks.
95. The calculated drag factor of 0.67g is consistent with a well-traveled asphalt roadway and with 100's of tests which I have conducted on similar roadways in the past.
96. The subsequent acceleration drove his vehicle into the rear of the Dodge Charger. As stated by witnesses, Mr. Fehrle's vehicle struck the rear of the Dodge Charger multiple times, as if to push it out of the way. This is consistent with Mr. Fehrle's vehicle acceleration being interrupted by the impact with the Dodge Charger, traveling at a slower speed.
97. Multiple witnesses stated Mr. Fehrle's vehicle was driving between cars and then moved to the left edge of the roadway, where it entered into a clockwise rotation.
98. Mr. Fehrle's vehicle traveled across the roadway where it struck the curb and rolled over.
99. The reported and analyzed dynamics of Mr. Fehrle's vehicle are consistent with Mr. Fehrle having a seizure and being unable to control the vehicle.
100. Additionally, the vehicle movements are consistent with the passenger of the vehicle trying to take control and bring the vehicle to a safe stop. Mr. Fehrle was having his seizure during the initial multiple strikes to the rear of the Dodge Charger.
101. The movements between the vehicles and the clockwise rotation are consistent with the front seat passenger grabbing the wheel and attempting to control the vehicle.
102. The front seat passenger heroically attempted to take control of the vehicle during this incident.
103. Mr. Fehrle was given seizure medication while in the hospital after the August 21, 2016 accident.
104. It is my opinion this crash was the direct result of Mr. Fehrle having a seizure, something he had no control over.
105. It is my opinion that Corporal Walp failed to properly apply his training in this case, failed to be diligent in his investigation, and the SCMPD failed to properly supervise and monitor Officer Walp's investigation resulting in the unlawful and unconstitutional arrest, prosecution, and incarceration of Mr. Fehrle.
106. Corporal Walp's "investigation" in this case was constitutionally deficient.
107. It is my opinion, based upon my knowledge, training and experience, that Corporal Walp acted with malice toward Mr. Fehrle.

108. I charge $200 per hour for my expert witness work. Thus far, I have been paid a $2,000 retainer in this case.

**Expert Testimony:**

- Bain V. Ricker, CV20100223, State Court of Glynn County Georgia
- Tracy Moore and Benjamin Moore V. Central Mutual Insurance Company, USF&G Insurance Company, Swainsboro Concrete Products Inc., Tassie Andrews Jr. and DM&N Trucking Civil Action n2003CV76617
- State of Georgia V. Tassie Andrews Jr., Glynn County Police Department Case G0306334
- State of Georgia V. Annie Evans-Glodowski, Newton County Superior Court
- State of Georgia V. Bianca Vargas, CR0900683-063, Glynn County Superior Court
- State of Georgia V. Jennifer Milburn, G0502709, Glynn County Superior Court
- Elizabeth Rowe V. Ruby Jean Oglesby, 19BP16307, Glynn County Magistrate Court
- Smith V. Forrest Trucking, 14CV002, Superior Court of Wheeler County
- State V. Trevor Cannon, CR13-2235-J2, Superior Court of Chatham County
- Cannon V. City of Savannah, CV19-3441

➢ Cases in which I have worked as an expert over the years but do not have specific information readily available:
- Superior Court of Emanuel County, Georgia (Civil Plaintiff)
- Superior Court of Chatham County, Georgia (Criminal Defense, Civil Plaintiff)
- State of Georgia V. Bradley Fehrle
- Superior Court of Glynn County, Georgia (Criminal Prosecution)
- State Court of Colquitt County, Georgia (Criminal Prosecution)
- State Court of Glynn County, Georgia (Criminal Prosecution)
- Magistrate Court of Glynn County, Georgia (Criminal Prosecution, Civil Defense)

Eric F. Naugle
ACTAR #1258
(912) 258-2521